14092

EPPS *ET AL.* v. ATLANTIC COAST LINE R. CO.

(180 S. E., 559)

*Messrs. F. L. Willcox* and *J. D. O'Bryan,* for appellant,

*Mr. A. C. Hinds,* for respondents,

June 13, 1935.

The opinion of the Court was delivered by MR. JUSTICE FISHBURNE.

This action was brought in the Court of Common Pleas for Williamsburg County, to recover damages alleged to have been sustained by the plaintiffs by fire which burned over their lands near Cades, S. C., on the 14th day of June, 1934. The complaint alleges that on that day, at about 12:30 o'clock p. m., a locomotive engine of the defendant, pulling a southbound freight train, communicated fire to the eastern edge of the defendant's right of way, which fire, as a result of a strong wind blowing in the direction of plaintiff's land, burned over about 200 acres thereof. Damages were claimed in the sum of $1,500.00.

The defendant denied the material allegations of the complaint.

The case was tried before his Honor, Judge G. D. Oxner, and a jury on November 20, 1934.

Motions for nonsuit and directed verdict were made in due course by the defendant, and both motions were denied by the Circuit Judge. The cause was then submitted to the jury, and verdict was found for the plaintiff in the sum of $500.00.

This appeal is taken from the judgment duly entered, the defendant alleging error on the part of the Circuit Judge in denying the motions for a nonsuit and directed verdict. .

Counsel for appellant and counsel for respondent state that the only question for consideration upon this appeal is whether or not there was sufficient testimony to warrant the submission of the case to the jury.

The complaint states two causes of action, one charging statutory liability, and the other charging negligence. In our view of the case it will not be necessary to consider the action for negligence.

The primary question for us to pass upon is, did the fire which burned over the plaintiff's lands originate from a spark emitted from the smokestack of the defendant's locomotive?

· This suit is based upon the following provision of Section 8362 of the South Carolina Code 1932: "Every railroad corporation shall be responsible in damages to any person or corporation whose buildings or other property may be injured by fire communicated by its locomotive engines."

We have made a most painstaking examination of the testimony in this case, and are of the opinion that the Circuit Judge committed no error in submitting the issues to the jury. He was correct in overruling both the motion for a nonsuit and the motion for a directed verdict.

From the testimony for the plaintiff, it is reasonably inferable that the fire in question was communicated to the plaintiff's land by a spark from the defendant's locomotive which at the time was pulling a long train of freight cars, consisting of 37 loads and 53 empties.

Consideration of the entire testimony strengthens this conclusion.

There was testimony for the plaintiff showing that a short community road runs parallel with the defendant's railroad track, and is located on its right of way, which local people use in going to and from church; that on the outside edge

of this road there is a ditch; and that the fire originated in dead grass between the ditch and the road, and from that point swept on under a high wind—"like a high March wind"—until it reached plaintiff's lands, where the alleged damage was done.

It was further shown that there had been no rainfall for a long time; that the wind was blowing from the railroad track, or the point of origin of the fire, toward the plaintiff's property; and that there was dead, dry grass on the right of way; that the southbound freight train passed over the railroad at the place where the fire originated between 12 o'clock noon and 1 o'clock p. m.; that it was a long train, and running pretty fast. A train dispatcher of the defendant testified that the train left Florence at 10:49 o'clock a. m., and reached Lanes at 12:38 o'clock p. m., and that the distance from Florence to Cades, which was the locale of the fire, was 29 3/10 miles.

David Fulmore, a witness for the plaintiff, who lived about 100 yards east of the railroad, in the field near where the fire originated, testified that he was at home that day before the fire started; that he did not see any one at all traveling that morning on the dirt road; and that there was no other fire in the community that day except the fire in question. He further testified that the fire started right in the road, and "you could tell where the sparks hit the grass." He was in his house when the train passed, and five minutes later, when he came out, he saw the fire.

James Holmes, a Negro witness, who testified for the plaintiff, stated that he was about 300 yards west of the railroad, sitting on a canal bank minding a cow, and had an unobstructed view of the railroad, and that just as the train passed by he saw smoke on the opposite side of the railroad from him. The following questions and answers are found in his testimony on cross examination by Mr. Willcox, which we consider as having a very important bearing upon the issue here as to the origin and cause of the fire:

"Q. I understand just as the train was passing you saw smoke flare up. A. Yes, sir.   *   *   *

"Q. When you first saw it how much fire was there? A. Just a puff of smoke, and when I carried the cow off it was blazing up.   *   *   *

"Q. When you first saw the fire where was the train? A. The train had got about a half-mile out the way when I first saw the fire."

H. H. Sauls, a witness for the plaintiff, stated that he saw the southbound freight train pass about noon, and saw the smoke right after the train passed.

The foregoing testimony was sufficient to take the case to the jury.

At least three witnesses for the defendant testified that they saw the smoke from this fire before the southbound freight train passed. No member of the train crew testified, but two witnesses for the defendant testified that the spark arrestor on this locomotive, and the other fire prevention appliances were in perfect condition. It was also testified that this locomotive used coal for fuel.

B. Thornberg, a witness for the defendant, was asked the question, "Now, Mr. Thornberg, will you tell the jury very briefly what becomes of the spark from the time it leaves the box until it goes out the smokestack?" and in answer to this question he explained in detail the route the sparks follow until they finally emerge through a one-eighth inch steel wire netting, and thence through the smokestack. It was his opinion that there was not a chance of a locomotive equipped as this one was, throwing a spark of sufficient vitality to set something afire 58 feet away from the railroad track.

On cross examination by Mr. Hinds, he testified as follows:

"Q. Why do you inspect the spark arrestor? A. Because the front has to be opened every trip to clean out the clinkers lodged in the front of the engine. They cannot get out any other way.

"Q. If they are not cleaned out, what happens? A. The engine will not steam as well as when you got a space of nine to ten inches from the bottom of the smoke box to the draught sheet.

"Q. Does the spark arrestor always remain one hundred per cent. A. Yes, sir; if it is not it is repaired.

"Q. Does it get out of repair? A. The spark arrestor is tested from the time the engine goes through for working, when the engine is cut out. If the net is thin any place, it is taken out and a new net put in.

"Q. Well, you have discovered a piece of machinery that never goes wrong? A. Yes, sir; it gets thin, but that is taken care of, because it is inspected every trip.

"Q. And you inspect it, looking for anything that is wrong? A. Yes, sir; we do.

"Q. And then it can get wrong? A. Yes, sir; but we don't let it get wrong. We inspect it to see that it does not get wrong.

"Q. And your theory is that a spark cannot get out there? A. If a spark was to go through that netting—

"Q. I am just asking, will you tell this jury that a spark cannot get through one of those arrestors, that spark arrestor never gets wrong, and it always performs perfectly? A. No, sir; I say it wears thin and it is repaired.

"Q. Well, does a spark arrestor ever go bad? A. Well, I have never had one to go bad.

"Q. Will you tell me they will never go bad and that trains do not now throw sparks? A. I have not been on the road, but I go by the standard locomotive builders.

"Q. You don't go out on the road? A. No, sir; I stay in the shop.

"Q. And you inspect the train while it is standing still? A. Every engine comes in for inspection.

"Q. The engineer drives it in and you go on the train and inspect it? A. Yes, sir; it is inspected by the machinist and boilermaker."

There was no evidence in this case that any one actually

saw the alleged spark, nor that prior to the fire in question the engines of the defendant had been seen throwing out sparks.

The defendant relies upon the cases of *Metz v. Charleston & Western Carolina Railway Company,* 125 S. C., 1, 117 S. E., 725, *Bankers' & Shippers' Insurance Company v. Charleston & Western Carolina Railroad Company,* 138 S. C., 339, 136 S. E., 557, and *Blakely v. Atlantic Coast Line Railroad Company,* 172 S. C., 343, 174 S. E., 15.

While the facts in these cases bear a recognizable family resemblance to the facts in the case at bar, yet they are too dissimilar to be controlling, and a detailed differentiation would serve no useful purpose.

It is true that in *Blakely v. Atlantic Coast Line Railroad Company, supra,* the Court held that in suits under this statute (Section 8362, 1932 Code) no presumption will arise that a locomotive caused a fire simply because the locomotive was in the vicinity shortly before the fire was discovered, and further held that there must be proof of some act upon which the presumption can be based. However, the "act" above referred to would in this case refer to the ejection of sparks, which may be proved by circumstantial evidence. It seems to be the contention of the defendant that in order to establish its liability in a case arising under this statute, testimony must be submitted from some witness to the effect that he actually saw sparks emitted from the locomotive smokestack, observed their trajectory, watched their descent, and saw fire ignite therefrom. We cannot approve such a rigid and exacting rule of evidence. To do so would in many cases practically nullify the effect of the law.

It would take an eagle eye to note the flight of a spark in the daytime.

The respondent relies upon the case of *Fleming v. Railway Company,* 120 S. C., 242, 113 S. E., 73, and the case of *Mitchum v. Seaboard Air Line Railway Company,* 115 S. C., 500, 106 S. E., 769.

In *Fleming v. Railway Company, supra,* the Circuit Court directed a verdict for the defendant, which was reversed by this Court. The record in that case showed that there was no emission of sparks. The substance of the testimony given by plaintiff's witness is as follows: Lives between 300 and 400 yards from the railroad track; on the morning of fire was in yard; heard train pass about 10 o'clock; was running very fast; shortly after saw smoke rise; it got larger and larger; after train passed, saw smoke not very long, maybe a half hour; shortly after looked and saw smoke rise; then looked to see which way the fire was going; went out from house near enough to see the fire; was on other side of the railroad; fire on side toward turpentine boxes; fire burned from railroad; saw no fire before train passed; saw trash or rubbish burning by the side of railroad track.

Chief Justice Gary, who rendered the opinion in this case, which was unanimously concurred in by the Court, held that this testimony *alone* (italics ours), which we have given the substance of, is susceptible of a reasonable inference in favor of the plaintiff.

The facts in the case at bar are even stronger.

The case of *Green Brabham Company v. Railroad Company,* 87 S. C., 258, 69 S. E., 290, 292, is also very much in point on one phase of the testimony in the case at bar. That was an action to recover damages on account of fire alleged to have been set out by a spark from one of defendant's engines. The defendant requested the Court to charge that if its engine was equipped with spark arrestor and the most modern equipment for the prevention of fire, and the same were in good order, negligence should not be attributed to the defendant in the absence of testimony *showing that sparks were being emitted from the engine.* (Italics ours.)

The Court held that this request was properly refused, and Mr. Justice Hydrick, who delivered the opinion, had this to say: "That an engine was properly equipped and carefully and skillfully managed are facts for the considera-

tion of the jury in determining the question of negligence, when that is an issue, *or in determining the question whether it did, in fact, emit sparks upon any occasion* [italics ours], but the Court cannot say as matter of law that evidence of such equipment and management conclusively negatives either proposition; because we know from experience and observation that the most improved and skillfully devised machinery and appliances sometimes fail to perform their functions, and that the most careful persons are sometimes negligent."

In our opinion it is clear that the testimony was susceptible of more than one reasonable inference, and therefore the Circuit Judge committed no error in submitting the case to the jury.

It is the judgment of this Court that the judgment of the Circuit Court be affirmed.

MR. CHIEF JUSTICE STABLER, and MESSRS. JUSTICES CARTER, BONHAM, and BAKER, concur.